IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MHKJ

PHYLLIS M. KELLEY,           )
                             )
    Plaintiff,                )   Case No. 07-CV-6350
                             )
vs.                          )   Judge Arlander Keys
                             )
MICHAEL J. ASTRUE,           )
                             )
    Defendant.                )

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Phyllis M. Kelly, moves this court for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied her claim for Disability Insurance Benefits ("DIB"). 42 U.S.C. § 401 et seq. (West 2007). Defendant Commissioner has filed a Cross-Motion for Summary Judgment. For the reasons set forth below, the Court grants Plaintiff's Motion for Summary Judgment, denies the Commissioner's Cross-Motion for Summary Judgment, and remands the matter back to the Commissioner for further proceedings consistent with this Opinion.

**Procedural History**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on August 17, 1999, alleging a disability onset date of November 25, 1998, due to borderline intellectual functioning and epilepsy. R. 40, 105B, 105J. Her application was denied on February 22, 2000. On March 23, 2004, Plaintiff

requested that her claim be reopened and readjudicated pursuant to the *Hickman v. Apfel* acquiescence ruling. The Social Security Administration ("SSA") denied this request on December 14, 2004 on the grounds that *Hickman* did not apply to Plaintiff's case. Plaintiff filed a request for reconsideration on January 5, 2005, which was denied on March 21, 2005. On April 6, 2005, Plaintiff filed a request for an administrative hearing, which was granted.

The hearing was held on May 2, 2006, before Administrative Law Judge ("ALJ") John Kraybill. R. 273. Plaintiff, who was represented by an attorney, testified at the hearing, along with Vocational Expert ("VE") James Breen, medical Expert ("ME") Dr. Larry Kravitz, and Vocational Rehabilitation Expert Pamela Tucker. Mr. Charles Jardine and Mr. Michael G. O'Reilly also testified as witnesses on Plaintiff's behalf.

In a decision dated June 30, 2006, the ALJ found that Plaintiff was not disabled, because she had been engaged in Substantial Gainful Employment. R. 27. On October 3, 2007, the SSA's Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final determination of the Commissioner. R. 5. Plaintiff filed suit in this Court on November 8, 2008.

**Record Evidence**

## I. Medical Evidence

Childhood Psychological and Mental Evaluations

When she was five years old, Plaintiff underwent a psychological examination at the Proviso Township Area Department of Education for Exceptional Children, to determine her eligibility for placement in a classroom for mentally handicapped children. The corresponding report, dated July 15, 1963, noted that Plaintiff had experienced convulsions and lost consciousness for 45 minutes when she was three years old. R at 180. She was subsequently placed on phenobarbital. The report indicated that Plaintiff's language development had progressed within normal limits until she was two years of age, but then slowed dramatically.

An examination conducted by Dr. Rutherford at the Northwestern School of Speech concluded that the five year old girl's language structure and vocabulary were at the level of a 2 ½ year old; that she had poor auditory memory, and that she was hyperactive and easily distracted. R at 181. Plaintiff exhibited impulsiveness associated with neurologically impaired children. The report concluded that, while Plaintiff might one day be a candidate for educable mentally handicapped placement, she would be admitted to the program only on a trial basis.

3

On July 22, 1963, Plaintiff was examined by Dr. M.A. Perlstein, who noted that Plaintiff had left focal seizures and a low I.Q. Dr. Perlstein opined that Plaintiff's behavior problems were likely attributable to her I.Q., he recommended that Plaintiff's parents undergo counseling. R at 184.

On October 13, 1975, when Plaintiff was 13 years old, Plaintiff was examined by Dr. Jack Arbit, PhD, who administered I.Q. tests. R at 187. On the Wechsler Adult Intelligence Scale ("WAIS") Plaintiff obtained a verbal IQ score of 69, a performance IQ score of 78 and a full-scale IQ of 71. Dr. Arbit noted that Plaintiff's speech was somewhat hard to understand. Dr. Arbit also found that Plaintiff's perceptual disturbance was related to cognitive, conative disturbance, and memory disturbances, which seem to be the result of a disturbance during the pre-natal period or birth condition. Dr. Arbit reported that there was no basis for thinking that her deficits might be reversible. R at 188.

Adult Psychological Evaluations

At the request of the SSA, Plaintiff submitted to a psychological evaluation conducted by Dr. Don White, PhD, on November 2, 1999. R at 189. Dr. White noted that Plaintiff was premature at birth and suffered from a lack of oxygen to the brain. Plaintiff suffered from epileptic seizures from birth until age 17, when the seizures stopped. *Id.* On the 3rd

edition of the WAIS, Plaintiff obtained a verbal IQ score of 63, a performance IQ score of 65, and a full scale IQ score of 61, reflecting mild mental retardation. Dr. White noted that Plaintiff's intelligence subtest results reflect significant impairment in the fund of information, fund of vocabulary, visual-motor coordination, concentration/attention, short term memory, comprehension, problem-solving and judgment, and impairments in the ability to make social judgments and plan sequences and dates. R at 191. Dr. White further noted that Plaintiff likely would be unable to manage funds, as her arithmetic functioning is substantially limited. R at 192.

Psychologist Julia B. Jermar, PhD. Conducted a non-examining review of Plaintiff's medical records on behalf of the SSA. On January 8, 2000, Dr. Jermar completed a Psychiatric Review Technique form, which was also stamped by Erika B. Altman, PhD. The PRT form revealed that Plaintiff was significantly subavereage in her general intellectual functioning, with deficits in adaptive behavior, initially manifested during the developmental period, and pervasive disorder, characterized by social and significant communicative deficits originating in the developmental period. R at 199. Dr. Jermar noted the IQ scores reported by Dr. White, and opined that Plaintiff had slight limitations in the activities of daily living, had difficulties in maintaining social functioning, and often had deficiencies of

concentration, persistence or pace, resulting in failure to complete tasks in a timely manner. R at 202. Dr. Jermar also completed a Mental Residual Functional Capacity Assessment, finding that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods but that otherwise she had not significant limitations. R at 204. Dr. Jermar also opined that Plaintiff was capable of managing her own finances, and completing simple, routine tasks. R at 206.

Hinsdale Orthopaedic Osteoporosis Center

On December 7, 2004, Dr. Steven G. Bardfield prepared a bone densitometry report on Plaintiff's spine at L1-L4 and Femur left neck at the Hinsdale Orthopaedic Osteoporosis Center. R at 236-37. Dr. Bardfield determined that Plaintiff had low density at the left neck and her lumbar spine suggested degenerative arthritic changes, which may be falsely elevating her bone mineral density ("BMD"). Rat 236. Therapy was recommended to reduce fracture risk. R at 236.

Hinsdale Hospital

Plaintiff underwent an MRI at Hinsdale Hospital on March 12, 2005 for lesions on her brain. R at 233. This MRI was compared to a previous MRI dated July 23, 3004. A left posterior frontal and parietal lobe focal area of calvarium thickening was again noted, remaining stable in size and appearance. The etiology of

the lesions remained uncertain, but Paget's disease was the most likely diagnosis. Multiple paraventricular and subcortial white matter lesions were noted and chronic ischemic changes or vascular etiology were described as the likely cause. R at 234.

Vocational Rehabilitation Report

Rehabilitation Consultant Pamela Tucker, M.S., C.R.C., conducted a file review and completed a report on March 13, 2006. Ms. Tucker reviewed Plaintiff's medical and employment history, and noted that Plaintiff had been employed in a specialized employment position as a cleaner at McDonald's since 1984. R at 241. Ms. Tucker noted that Plaintiff was able to maintain the position by working with the Department of Human Services, and that she works with other individuals with developmental disabilities who are closely supervised.

Ms. Tucker reported that Plaintiff's position at McDonald's was created for her, to accommodate her impairments and limitations; Plaintiff works at her own pace and she does so only four days each week, six hours each day. Ms. Tucker spoke with Plaintiff's manager at McDonald's, Mr. Jim McKneely, who stated that Plaintiff could not work under normal conditions, that she has problems keeping pace and staying on task and that she cannot work directly with customers, because she acts socially inappropriate around them. Mr. Tucker also noted that Plaintiff has worked with a vocational counselor, Maria Martinez, at the

Office of Rehabilitations Services for several years to obtain her employment. Ms. Tucker determined that Plaintiff's position at McDonald's would not be classified as competitive employment due to her specialized supervision and accommodations for her impairments. R at 242. For Plaintiff's job to be considered competitive, she would need to earn $800 per month, or work 40 hours per week- criteria that Plaintiff does not meet. Ms. Tucker concluded that Plaintiff's mental impairments rendered her unable to maintain competitive employment, because she could not maintain attention and concentration or properly stay on task, because she needs close supervision, and because she cannot work in close proximity to coworkers or customers. These limitations precluded Plaintiff from all work, including unskilled work.

After the hearing, however, Ms. Tucker amended her report. The amended report is dated May 23, 2006. R at 267. Ms. Tucker reported that she had recontacted Plaintiff's supervisor at McDonald's. The supervisor stated that McDonald's had attempted to apply for a stipend for employing Plaintiff, but that Plaintiff was not eligible, because she had been employed for too long. He stated that Plaintiff did not have a job coach and did not need one. He further stated that Plaintiff was independent in the performance of her cleaner duties and that the McDonald's staff supervisors were able to supervise her closely. Finally, he confirmed that Plaintiff did not receive any other specialized

8

services in conjunction with her employment at McDonald's. Plaintiff's 2006 job performance review reported that Plaintiff's overall performance was good, but that she needed to talk less on the job and focus on her work.

## II. Testimony at the Hearing

Plaintiff's Testimony

Plaintiff testified that she was 48 years old, and lives alone with her dog. R at 313. Plaintiff stated that she was born premature and suffered a lack of oxygen to her brain, which caused brain damage. She sees Dr. Augustino frequently for check-ups, because there is a history of heart disease and cancer in her family. Plaintiff also stated that she suffers from rheumatoid arthritis in both knees. R at 314.

Plaintiff testified that she began working at McDonald's on February 13, 1984. She explained that her father drove her to fill out the application at McDonald's and she was hired a few days later. Plaintiff began working three hours a day, but received more hours when she asked for them. R at 316. Plaintiff testified that McDonald's initially trained her to work on the grill. She was then moved to salads, the dining room, and later french fries. Plaintiff worked from 8:00 am until 2:00, with a break at 10:30 am.

Plaintiff testified that she has several friends, including Mr. Jardine, the lawyer who assisted her parents in creating

9

trusts for her benefit, and Mr. O'Reilly, a Trust Officer at the First National Bank of LaGrange, where Plaintiff is a trust customer. Plaintiff talks with these men at least four to six times each year, if she has questions or needs legal help. R at 319. Plaintiff stated that she also speaks to Mary Jane, the receptionist at LaGrange Bank, and frequently speaks to other bank employees. R at 320. Plaintiff also explained that she frequently calls her attorney for various reasons, including to tell him that she purchased a new dress to wear to the hearing. R at 321.

Plaintiff stated that Mr. Jardine told her about Ms. Martinez at the Office of Rehabilitations Services. Plaintiff ultimately contacted and began working with Ms. Martinez. Plaintiff testified that her vocational counselor visited her at McDonald's on one occasion, but she did not assist Plaintiff in obtaining her job. R at 331.

Charles Jardine

Mr. Jardine testified that he met Plaintiff approximately ten years ago, when he assisted her parents in creating a trust for her benefit. R at 281. In the years since he created the trust, Plaintiff has frequently called him and/or his secretaries to discuss various social, medical, or employment issues. R at 284. Mr. Jardine described Plaintiff as being highly impressionable, childlike, and "truly disabled." R at 284.

10

Michael G. O'Reilly

Mr. O'Reilly testified that he met Plaintiff through his position as a trust officer with the First National Bank of LaGrange in LaGrange, Illinois. He met Plaintiff in 1999, and has been involved with the day to day administration or portfolio management of her trust since that time. R at 289. Mr. O'Reilly explained that Plaintiff's parents set up two irrevocable trusts for her benefit.

Mr. O'Reilly stated that he or his staff have weekly contact with Plaintiff, to discuss any matter that she considers to be important. While Plaintiff manages to pay her own utility bills, the bank pays her property taxes and home related expenses, and helps her with large purchases, such as automobiles. R at 292. Mr. O'Reilly stated that Plaintiff is very trusting and vulnerable, and he fears that she is frequently taken advantage of by unscrupulous people.

While he is unfamiliar with Plaintiff's medical condition(s), he has worked with her to pay off a number of medical expenses. R at 294. Mr. O'Reilly testified that he knew that Plaintiff was meeting with the State Rehabilitation Department in an attempt to find another job, and that she wanted to obtain her certificate to become a school teacher. He characterized both pursuits as unrealistic. R at 295.

Larry Kravitz, Medical Expert

Dr. Larry Kravitz testified as the Medical Expert ("ME") at the hearing at the behest of the ALJ. Dr. Kravitz testified that he had never examined Plaintiff, but that he had reviewed the record evidence. R at 322. Based upon this review, Dr. Kravitz testified that Plaintiff had a history of limited intellectual functioning that dated back to age five. Dr. Kravitz testified that the evidence available when the SSA denied Plaintiff's initial application did not support a finding that her condition met or equaled a listing. R at 324. Dr. Kravitz opined that Plaintiff would have been limited at that time to performing simple, routine work. Dr. Kravitz testified that, based upon the current evidence, including Plaintiff's testimony, Plaintiff did not have a condition that met or equaled a listing. He did conclude, however, that Plaintiff was moderately limited in several areas of mental functioning, including the areas of concentration, persistence, and pace, and in her ability to carry out detailed instruction. R at 325-28. Dr. Kravitz testified that Plaintiff was mildly restricted in the activities of daily living and social functioning.

Pamela Tucker, Vocational Rehabilitation Counselor

Ms. Tucker testified that, in her professional capacity, she frequently works with individuals with developmental disabilities. R at 302. With respect to Plaintiff, Ms. Tucker

noted that she receives "a lot of help from outside resources" with her finances and legal issues. R at 301. In addition, Ms. Tucker testified that Plaintiff's employer provides her with special accommodations. Ms. Tucker conceded that she had not visited Plaintiff at McDonald's, but stated that she had spoken with Plaintiff's supervisor, who stated that Plaintiff had the ability to work at her own pace, and that McDonald's provided her with special supervision to ensure that she did her job properly. R at 302, 305. Ms. Tucker testified that McDonald's did not allow Plaintiff to interact with customers, because she had displayed inappropriate behavior in the past.

Ms. Tucker informed the ALJ that Plaintiff originally obtained her job in 1984 with the assistance of her father, who accompanied her to apply for the job and assisted Plaintiff in completing the application. R at 306-307. Ms. Tucker testified that she was not aware of any impairment related expenses that Plaintiff had incurred to enable her to work, and she did not know whether Plaintiff had obtained any tax advantages by employing Plaintiff. R at 309. Ms. Tucker stated that McDonald's had essentially created a cleaning job for Plaintiff to accommodate both her mental and physical limitations. Plaintiff is allowed to take more time to complete tasks, such as cleaning tables, booths and restrooms, as well as taking out the garbage and changing soap dispensers. R at 303-304.

Ms. Tucker noted that Plaintiff had been diagnosed with mental retardation, epilepsy, asthma, allergies, arthritis and with bilateral knee pain. Ms Tucker opined that, in light of McDonald's various accommodations for Plaintiff's mental and physical limitations, Plaintiff was not competitively employed. Ms. Tucker further testified that, in order for Plaintiff's employment to be considered competitive, she would need to earn $800 each month or work 40 hours per week, but Plaintiff does not meet that criteria.

### James Breen, Vocational Expert

The ALJ invited vocational Expert ("VE") James Breen to testify at Plaintiff's hearing. The ALJ asked VE Breen whether, based on the ME's findings, an individual with mild restrictions in the activities of daily living and moderate restrictions in the ability to understand and carry out detailed instructions would be able to perform the type of work that Plaintiff was performing during September of 1999 through August of 2000. The VE testified that this hypothetical individual could perform Plaintiff's position as a dining room attendant or cleaner, an unskilled light level job. R at 332. The VE further stated that a wide range of unskilled light occupations would allow for these restrictions. However, taking into account all of the restrictions described by Pamela Tucker and the ME, the VE opined that Plaintiff would be foreclosed from engaging in competitive

employment. R at 331, 333.

**The ALJ's Decision**

The ALJ's decision is noteworthy only for its succinctness. The ALJ first determined that Plaintiff met the first three elements for re-adjudicating a case under *Hickman v. Apfel*, because she lived in Illinois at the time of the prior decision, she received a decision dated on or after August 6, 1999, and the rule in *Hickman* had not been previously applied to her claim. R at 26. The ALJ then determined at Step One that, because Plaintiff had engaged in disqualifying substantial gainful activity, she was not entitled to a period of disability or disability insurance benefits. R at 26-27.

## STANDARD OF REVIEW

The district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnard*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v.*

*Barnard*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DIB must prove that she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must

evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

**DISCUSSION**

The sole issue before the Court is whether the ALJ's determination at Step 1, that Plaintiff had engaged in disqualifying substantial gainful activity ("SGA"), was supported by substantial evidence. The Commissioner correctly notes that, because this is a Step One decision, the medical evidence in the case is of little probative value. *See Jones v. Shalala*, 21 F.3d 191, 193 (7th Cir. 1994) ("If you are substantially gainfully employed, that is the end of your claim, even if you have compelling medical evidence that you really are disabled.")

The evidence demonstrates that Plaintiff had earnings in 2005 that created a rebuttable presumption that she was engaged in SGA[1]. Plaintiff argues that she has rebutted that presumption by demonstrating that her work activity cannot be considered SGA, because she performed it under "special conditions." POMS § DI 401.160.B. Plaintiff claims that her special work conditions

---

[1] Plaintiff does not dispute that her earnings in 2005 exceeded $11,000. R at 90.

17

were established by the testimony of and report submitted by Ms. Pamela Tucker, and the testimony of Mr. O'Reilly. The Commissioner attacks Plaintiff's evidence of special conditions by labeling Mr. O'Reilly's testimony irrelevant and by claiming that the supportive elements of Ms. Tucker's testimony and report were superceded by the more damning statements in her amended report.

The Commissioner's position would be more tenable if the ALJ had relied upon such reasoning in his decision. However, the ALJ's decision references only Ms. Tucker's amended report, and fails to mention any other testimony, the medical records, or even Ms. Tucker's original report. The ALJ's decision makes no effort to reconcile the supportive statements in Ms. Tucker's initial six page report with the less favorable, but not directly contradictory, remarks found in her one-page amended report.

In denying a claim of disability, the ALJ may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001); *Green v. Shalala*, 51 F.3d 96, 100-101. Rather, he must articulate, at some minimal level, the analysis supporting his conclusion, to permit meaningful review by the Court. *Steele v. Barnart*, 290 F.3d 936, 941 (7th Cir. 2002). The ALJ's failure to do so requires this Court to remand the matter back to the Commissioner. *Zblewski v. Schjweiker*, 732 F.2d 75, 78-79 (7th

Cir. 1984).

Upon remand, the Commissioner should also be mindful that Plaintiff has presented at least some evidence regarding Plaintiff's Impairment Related Work Expenses ("IRWE"). Social Security rules provide that certain expenses should be deducted from earnings in SGA determinations, regardless of whether these items and services are also needed for normal daily activities. SSR 83-33. And while the Commissioner is not required to accept Plaintiff's claim that her IRWE rebut the presumption that she is performing SGA, it was error for the ALJ not to address that evidence. See SSR 83-33.

## CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's Motion for Summary Judgment, and GRANTS Plaintiff's Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further action consistent with this Opinion.

Dated: September 24, 2008    E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge